# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| I.D.I. INTERNATIONAL DEVELOPMENT and INVESTMENT CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Court No. 20-00107 |
| v. | ) ) | **PUBLIC VERSION** |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CATFISH FARMS OF AMERICA, et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. McCARTHY
Assistant Director

OF COUNSEL:
KIRRIN HOUGH
Attorney
Office of the Chief Counsel
   for Trade Enforcement and Compliance
U.S. Department of Commerce

KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel. (202) 305-7571
Fax (202) 514-8624

March 31, 2021

Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.    Administrative Determination Under Review................................2

    II.   Issues Presented For Review........................................................2

STATEMENT OF FACTS........................................................................................2

SUMMARY OF ARGUMENT..................................................................................8

ARGUMENT............................................................................................................9

    I.    Standard Of Review ....................................................................9

    II.   Substantial Evidence Supports Commerce's Determination That IDI Is Not Entitled To A Separate Rate........................................10

        A.    Legal Framework For Separate Rates ...............................10

        B.    Substantial Evidence Supports Commerce's Finding Of *De Facto* Government Control.......................................12

    III.   Commerce's Determination That IDI Is Not Entitled To A Separate Rate Is Lawful ......................................................17

        A.    Once A Separate Rate Applicant Fails To Establish One Criterion, Commerce Need Not Analyze The Remaining *De Facto* Criteria ..18

        B.    Commerce's Determination That The Vietnamese Government Has Ownership Interest In, And Control Over, IDI Is In Accordance With Law...................................................21

            1.    Legal Framework Of Ownership And Control In Commerce's Separate Rate Analysis.......................21

            2.    The Vietnamese Government's Ownership Interest In IDI ..24

            3.    Commerce's Determination That The Vietnamese Government Potentially, And Actually, Controlled IDI, Is In Accordance

        With Law ...................................................................................... 26

CONCLUSION ............................................................................................ 28

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Adv. Tech. & Materials Co. v. United States,*
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) .............................................. 12, 19, 20, 22

*Adv. Tech. & Materials Co. v. United States,*
   885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ................................................................ 22

*AMS Assocs. v. United States,*
   719 F.3d 1376 (Fed. Cir. 2013) ..................................................................... 10, 11, 17

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) ......................................................... 22, 23

*An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United State*s,
   203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) ............................................................... 20

*Ceramica Regiomontana, S.A. v. United States*,
   810 F.2d 1137 (Fed. Cir. 1987) ...................................................................................... 10

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ......................................................................................................... 9

*Diamond Sawblades Mfrs. Coalition v. United States,*
   866 F.3d 1304 (Fed. Cir. 2017) ..................................................................................... 10

*Huvis Corp. v. United States,*
   525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ............................................................... 17

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992) ......................................................................................................... 9

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
   121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) ............................................................... 14

*Michaels Stores, Inc. v. United States,*
   766 F. 3d 1388 (Fed. Cir. 2014) ................................................................................... 10

*New Mexico Garlic Growers Coal. v. United States,*
   953 F.3d 1358 (Fed. Cir. 2020) ..................................................................................... 17

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ................................................................. 9

*Qingdao Taifa Grp. Co., Ltd. v. United States*,
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ............................................. 22

*Shandong Rongxin Import & Export Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ....................................... 18, 19

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) ........................................................... passim

*Timken Co. v. United States*,
    699 F. Supp. 300 (Ct. Int'l Trade 1988) ..................................................... 9

*Transcom, Inc. v. United States*,
    294 F. 3d 1371 (Fed. Cir. 2002) ............................................................... 10

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ............................................................................ 9, 10

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ................................................................................ 10

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998) ............................................................... 10

*Yantai CMC Bearing Co. v. United States*,
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ........................................ passim

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ............................................ 27

**Administrative Decisions**

*Sparklers from China*,
  56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) ....................... 11, 18

*Silicon Carbide from China*,
  59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) ....................... 11, 18

*Diamond Sawblades from China*,
  71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) ..................... 11, 17

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries,*
75 Fed. Reg. 78,676 (Dep't of Commerce Dec. 16, 2010) .............................................. 24

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries,*
78 Fed. Reg. 40,430 (Dep't of Commerce July 5, 2013) ................................................ 24

*Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China,*
79 Fed. Reg. 53,169 (Dep't of Commerce Sept. 8, 2014) .............................................. 20

*Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China,*
79 Fed. Reg. 68,860 (Dep't of Commerce Nov. 19, 2014) ............................................ 21

*53-Foot Domestic Dry Containers from the People's Republic of China,*
80 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) ............................................. 23

*1,1, 1, 2 Tetrafluoroethane (R-134a) from the People's Republic of China,*
82 Fed. Reg. 12,192 (Dep't of Commerce Mar. 1, 2017) .............................................. 22

*Truck and Bus Tires from the People's Republic of China,*
82 Fed. Reg. 8,599 (Dep't of Commerce Jan. 27, 2017) ............................................... 22

*Antidumping Duty Investigation of Stainless Steel Sheet and Strip from the People's Republic of China,*
82 Fed. Reg. 9,716 (Dep't of Commerce Feb. 8, 2017) ............................................... 22

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
83 Fed. Reg. 50,077 (Dep't of Commerce Oct. 4, 2018) ........................................... 2, 3

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
84 Fed. Reg. 9,087 (Dep't of Commerce Mar. 13, 2019) ............................................... 3

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
84 Fed. Reg. 56,420 (Dep't of Commerce Oct. 22, 2019) .............................................. 4

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) .............................................. 2

**Other Authorities**

Policy Bulletin No. 05.1 http://enforcement.trade.gov/policy/bull05-1.pdf. ........ 11, 18. 26

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| I.D.I. INTERNATIONAL DEVELOPMENT and INVESTMENT CORPORATION, | ) ) ) |  |
| Plaintiff, | ) ) | Court No. 20-00107 |
| v. | ) ) | **PUBLIC VERSION** |
| UNITED STATES, | ) ) |  |
| Defendant, | ) ) |  |
| and | ) ) |  |
| CATFISH FARMS OF AMERICA, et al., | ) ) |  |
| Defendant-Intervenors. | ) ) |  |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiff, International Development and Investment Corporation (IDI), ECF No. 30 (Pl. Br.). In its motion, IDI contests the Department of Commerce's (Commerce) final determination in the fifteenth antidumping duty administrative review covering certain frozen fish fillets from the Socialist Republic of Vietnam (Vietnam). As we demonstrate below, IDI's arguments are without merit. Accordingly, this Court should deny plaintiff's motion for judgment on the agency record and sustain the final results in their entirety.

**STATEMENT PURSUANT TO RULE 56.2**

## I.    <u>Administrative Determination Under Review</u>

The administrative determination under review is *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (final results) (P.R. 521), Appx1213-1216, and accompanying Issues and Decision Memorandum (IDM) (P.R. 515), Appx1194-1209.[1]   The period of review covered by the final results is August 1, 2017, through July 31, 2018.

## II.   <u>Issues Presented For Review</u>

1.      Whether substantial evidence supports Commerce's determination that IDI is ineligible for a separate rate, because IDI failed to demonstrate an absence of government control.

2.      Whether Commerce's determination that IDI is ineligible for a separate rate, because IDI did not demonstrate the absence of *de facto* control by the Vietnam government, is in accordance with law.

**STATEMENT OF FACTS**

On October 4, 2018, Commerce published the notice of initiation of the fifteenth administrative review of the antidumping duty order covering fish fillets from Vietnam. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 50,077 (Dep't of Commerce Oct. 4, 2018) (Initiation Notice), Appx1000-1011.

---

[1] "P.R." refers to public documents in the administrative record; non-public record documents are designated as "C.R."

2

Commerce initiated the review with respect to 76 companies, and subsequently rescinded the review of 52 companies. *See* Selection of Replacement Respondent for Individual Review (Dep't of Commerce Feb. 4, 2019) (C.R. 339, P.R. 199), Appx1060-1064; *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 84 Fed. Reg. 9,087 (Dep't of Commerce Mar. 13, 2019) (rescission in part). Commerce continued the review with respect to the remaining 24 companies, including IDI, for which a review was requested and initiated.

In the initiation notice, Commerce notified parties intending to apply for a separate rate from the Vietnam-wide entity that separate rate applications were due 30 days from publication of the initiation notice. *See* Initiation Notice at 1, Appx1000. IDI submitted a timely separate rate application on October 19, 2018. *See* IDI SRA (Oct. 19, 2018) (C.R. 9-15, P.R. 26-29), Appx1012-1059, Appx80012-80059. IDI also submitted responses to Commerce's supplemental separate rate application questionnaires in February 2019, April 2019, and June 2019. *See* IDI First Supplemental SRA (Feb. 19, 2019) (IDI First Supp. SRA) (C.R. 403-404, P.R. 336-337), Appx1065-1113, Appx80065-80276; IDI Second Supplemental SRA (Apr. 2, 2019) (IDI Second Supp. SRA) (C.R. 370-381, P.R. 244), Appx1114-1128, Appx80277-80292; IDI Third Supplemental SRA (June 25, 2019) (IDI Third Supp. SRA) (C.R. 456, P.R. 398), Appx1129-1145, Appx80293-80326.

In its separate rate application, IDI explained that it is a publicly-listed joint stock company on the Ho Chi Minh City Stock exchange. [▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇], an affiliate and parent company of IDI, is the largest shareholder with [▇▇▇]

percent of IDI's shares.  *See* IDI SRA at 3, Appx80019.  The remaining shareholders each hold a maximum of [███] percent of IDI's shares.  *See id*.

On October 22, 2019, Commerce published its preliminary results.  *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 84 Fed. Reg. 56,420 (Dep't of Commerce Oct. 22, 2019) (preliminary results) (P.R. 457), Appx1168-1172, and accompanying Preliminary Decision Memorandum (PDM) (P.R. 458), Appx1158-1167. Prior to Commerce issuing the preliminary results, Catfish Farmers of America submitted comments alleging that IDI had failed to demonstrate it was entitled to separate rate status.  Catfish Farmers of America Comments in Advance of Commerce's Preliminary Results of Review and Rebuttal Factual Information Submission at 7-12 (Sept. 10, 2019) (C.R. 441-445, P.R. 477-481), Appx1151-1156, Appx80332-80337.  Commerce determined that IDI had failed to rebut the comments from Catfish Farmers of America, and further determined in the preliminary results that information on the record indicated that IDI had not demonstrated the absence of *de facto* government control.[2]  *See* PDM at 6-7, Appx1164-1165.  Commerce, thus, preliminarily found that IDI was not eligible for a separate rate.  *See id.*

In the final results published in April 2020, Commerce continued to find that IDI had failed to establish an absence of *de facto* government control, and therefore, did not qualify for a separate rate.  *See* IDM at 25-34, Appx1199-1208.  Commerce provided further explanation of its denial of a separate rate to IDI in a confidential memorandum

---

[2] Commerce's statement in the preliminary results that IDI failed to demonstrate *de jure* control was an error, as Commerce explained in the results.  *See* IDM at 32 n.149, Appx1206.

attached to the final results. *See* BPI Addendum – IDI Separate Rate Memorandum (Dep't of Commerce Apr. 20, 2020) (IDI BPI Addendum) (C.R. 530, P.R. 516), Appx80392-80394.

In its analysis, Commerce found several avenues through which the Vietnamese government had impacted IDI's operation during the period of review. *See id*. First, Commerce found that the Vietnamese government was directly involved in the oversight of IDI's business through its representative, via [          ][3], on the boards of IDI and [        ][4]. IDM at 33, Appx1207. Board members are "charged with making 'important decisions of the company' as required by law," and also "select the company management, who in turn handle the day-to-day operations of the company, including setting export prices." *Id.* Mr. X also served as a manager of IDI's parent company, Company Y, and was involved in the day-to-day management of Company Y and, in turn, IDI. *See id.*; IDI Second Supp. SRA at 2, Appx80282. Mr. X's role as a "Deputy General Director" in Company Y involved him "meeting with customers and external parties," which Commerce determined made it "likely that Mr. X played a role in price negotiations and export practices." IDM at 33, Appx1207. During the period of review, Mr. X also held a position with a local provincial government (*i.e.*, "deputy of the People's Council of An Giang Province") as a member of the Communist Party of Vietnam. *See* IDM at 33, Appx1207; *see also* IDI First Supp. SRA at 4, Appx80074.

---

[3] Throughout the rest of the brief, when possible, we refer to this individual as "Mr. X," consistent with the IDM.

[4] As with Mr. X, we refer to the company as "Company Y," consistent with the IDM.

Thus, Commerce found that Mr. X's "presence on the board of IDI and Company Y, along with his role in Company Y's management, indicates that the {Vietnamese government} is involved in company-level decision making." IDM at 33, Appx1207.

Second, Commerce determined that Mr. X's authority and control over IDI and Company Y was furthered and emboldened by the presence of numerous Communist Party of Vietnam members and associates on the boards of both IDI and Company Y. *See* IDM at 33-34, Appx1207-1208. Commerce determined that there was "[███████ ████████████████████████████████████████████████████████ ███████], with the same also true for the IDI and [███████████████████]." IDI BPI Addendum at 1, Appx80392.

Commerce acknowledged that there is a distinction between an individual being a member of the Communist Party of Vietnam and having a "position of authority in the Vietnamese government," but rejected IDI's characterization that "'mere' membership in the Communist Party of Vietnam is meaningless for purposes of an analysis of government control." IDM at 33, Appx1207. For example, with Vietnam's one-party system, when an individual is also a member of the party, "membership signifies that an individual is not just sympathetic to the ruling Vietnamese government's goals, but is an active participant in furthering those goals." *Id.* In other words, when a government official like Mr. X "is in a position of authority and power in companies such as IDI and Company Y, absent record information to the contrary, it is reasonable to presume" that Communist party members "also in power in those companies will support and affirm the

6

votes and influence of that government official to further the goals of the Vietnamese government." *Id.* at 33-34, Appx1207-1208.

Indeed, Commerce observed that there was no record evidence to suggest that "any of the multiple Communist Party of Vietnam members/associates on the boards of both IDI and Company Y have ever voted or acted in a manner at odds with Mr. X, or acted in a way that undermined his, and thereby the {Vietnamese government's} authority." *Id.* at 34, Appx1208. As a result, Commerce determined that it was "reasonable to presume" that the Vietnamese government's "interests are represented in IDI (and Company Y) by the presence of the government official," Mr. X, and "furthered and expanded by the additional key Communist Party of Vietnam associates/members on the decision-making boards of those companies." *Id.*

Moreover, Commerce noted that the board powers of both Company Y and IDI include selecting management and that record evidence "demonstrates that informal arrangements influence decisions of the board." *Id.* And in terms of that informal influence on IDI operations, Commerce observed that "[███████████████████ ████████████████████████████████████]" and that IDI's board "[███████████████████████████████████████ ███████████████████████████████████████ ████████████]." IDI BPI Memorandum at 2, Appx80393. Lastly, "the provincial government, of which Mr. X is a member, [████████████████████ ██████████████████████████ *Id.*

Thus, Commerce determined that there are "several avenues through which the {Vietnamese government} can and does impact the operation of IDI." IDM at 34, Appx1208. Because Mr. X was a government official and both a manager of IDI's parent company, Company Y, and on the board of directors for both companies, Commerce determined that, taken together, the Vietnamese government could, and did, "control the company through traditional corporate control." *See id*.

This action followed.

## <u>SUMMARY OF ARGUMENT</u>

Substantial record evidence supports Commerce's determination that IDI failed to establish its autonomy from *de facto* government control with respect to its daily operations and its selection of management during the period of review. Mr. X was a member of the Communist Party of Vietnam and served on the board of directors for both IDI and its parent company, Company Y, and he was also a manager in Company Y, with his role indicating that the Vietnamese government is involved in company-level decision making. Substantial evidence also supports Commerce's finding that the boards are not only involved in management selection, but that Mr. X himself likely played a role in price negotiations and export prices. Consequently, Commerce's determination that the Vietnamese government not only had the potential to exercise control, but actually did exercise control, over IDI's operations is in accordance with law.

Thus, the Court should sustain Commerce's determination, as supported by substantial evidence and in accordance with law, that IDI has not established that it qualifies for a separate rate.

# ARGUMENT

## I.    Standard Of Review

This Court sustains Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 n.6 (2009).  Substantial evidence amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009), and "less than the weight of the evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Id.*

Moreover, "it is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record."  *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988).  Rather, when Congress has entrusted an agency to administer a statute in fact intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

Further, Commerce's statutory "interpretation{s} govern{} in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language

that is ambiguous." *Eurodif*, 555 U.S. at 316 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001)).  Crucially, "{a}n explicit explanation is not necessary, however, where the agency's path is reasonably discernible." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## II. Substantial Evidence Supports Commerce's Determination That IDI Is Not Entitled To A Separate Rate

### A. Legal Framework For Separate Rates

In antidumping proceedings involving non-market economy countries such as Vietnam, respondents have no statutory or regulatory right to their own separate rates. Rather, Commerce has developed a longstanding practice in which presumes that all companies within a non-market economy country are subject to government control over their export activities and should be assessed a single antidumping duty rate. *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)); *see also Transcom, Inc. v. United States*, 294 F. 3d 1371, 1381 (Fed. Cir. 2002); *Michaels Stores, Inc. v. United States*, 766 F. 3d 1388, 1390 (Fed. Cir. 2014).  Under this presumption, which has been upheld repeatedly by the Court of Appeals for the Federal Circuit, a respondent receives the non-market economy country-wide rate unless it affirmatively demonstrates an absence of both *de jure* and *de facto* government control.  *Id.*  If it does, and only then, will it obtain its own separate rate. But if the company fails to rebut the presumption of government control, it continues to receive the single, country-wide, dumping rate.  *See*

*Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304, 1311 (Fed. Cir. 2017). That is, under Commerce's longstanding practice, the company applying for a separate rate bears the burden to demonstrate that its export activities are free from *de jure* and *de facto* government control. *AMS Assocs.*, 719 F.3d at 1379-80; *see also Sigma Corp.*, 117 F.3d at 1405-6.

Commerce's practice further allows a party to establish an absence of *de jure* control by references to legislation and governmental measures that demonstrate a company's legal independence. *AMS Assocs.*, 719 F.3d at 1379. In evaluating whether a company is free from *de jure* government control, Commerce considers: (1) whether there is an absence of restrictive stipulations associated with the individual exporter's business and export licenses; (2) the applicable legislative enactments decentralizing control of a company; and (3) any other formal measures by the government decentralizing control of a company. *Diamond Sawblades from China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final admin. determ.).

A party may demonstrate the absence of *de facto* government control by providing evidence that: (1) the exporter sets its prices independently of the government and other exporters; (2) negotiates its own contracts; (3) keeps the proceeds of its sales (not including taxes); and (4) selects its management autonomously. *AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); *see also Diamond Sawblades from China*, 71 Fed. Reg. at 29,307; *Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,586-87 (Dep't of Commerce May 2, 1994) (final admin. determ.), and accompanying IDM (*Silicon Carbide* IDM); *Sparklers from*

*China*, 56 Fed. Reg. 20,588, 20,589 (Dep't of Commerce May 6, 1991) (final admin. determ.); Policy Bulletin No. 05.1 at 1, *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.  In addition, "an exporter in a nonmarket economy country must 'affirmatively demonstrate' its entitlement to a separate, company-specific margin."  *Sigma Corp.*, 117 F.3d at 1405.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria.  *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017); *see also Adv. Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (*Adv. Tech. II*) (affirming a determination where Commerce did not make a *de facto* finding on two of the four criteria).  Further, if an applicant fails to establish any *one* of the *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria.  *Yantai*, 203 F. Supp. 3d at 1326.

### B.  Substantial Evidence Supports Commerce's Finding Of *De Facto* Government Control

Substantial evidence supports Commerce's determination that the Vietnamese government was directly involved in the oversight of IDI's business through its representation, via Mr.  X, on the board of IDI and its parent company, Company Y.  *See* IDM at 31-34, Appx1205-1208; IDI BPI Addendum at 1-2, Appx80392-80393.  IDI argues that Commerce's conclusion is based entirely upon the involvement of only one

board member.  *See* Pl. Br. at 34.  According to IDI, "it stretches credulity for Commerce to find that a single board member's involvement with a local provincial government renders the critical decision making of a large corporate entity such as IDI and its parent company subject to the control of the {Vietnamese government} over its day-to-day activities."  *See id.* at 35.  In other words, IDI argues that Commerce "merely speculates as to the potential impact" of any Communist Party associations and that these assertions are "outdated stereotypes of the Communist Party in Vietnam."  *See id.* at 41-42.  We explain below why IDI's arguments are without merit.

First, Commerce based its finding that the Vietnamese government was directly involved in the oversight of IDI on record evidence that, during the period of review, Mr. X held a position with a local provincial government (*i.e.*, "deputy of the People's Council of An Giang Province") as a member of the Communist Party while also sitting on the board of IDI and Company Y.  *See* IDM at 33, Appx1207; IDI First Supp. SRA at 4, Appx80074.  Commerce deemed Mr. X's concurrent occupation of both positions to be significant because the board of directors were charged with making important company decisions, including the selection of company management, who in turn handle the day-to-day operations of the company, including setting export prices.  *See* IDM at 33, Appx1207; IDI SRA at 17, Appx80028 (noting that the board is involved in the "selection of management," and citing a specific "decision of the Board of Directors appointing the General Director of the company.").

Commerce further found that, in addition to his roles as a government official and member of IDI's and Company Y's boards, Mr. X also served as a manager of Company

Y during the period of review.  IDM at 33, Appx1207.  Specifically, Mr. X served as

████████████████████████████████████████████████████████████

██████████████████████  *See* IDI Second Supp. SRA at 2, Appx80282.  Commerce

observed that as a manager, Mr. X was "in charge of external affairs . . . and thus

responsible for arranging and attending meetings with the company's investors,

customers, partners and visitors from other companies."  *Id.* at 2-3, Appx80282-80283;

*see also* IDM at 33, Appx1207.  Based on this record evidence, Commerce determined

that Mr. X was involved in the day-to-day management of Company Y, and, in turn, IDI.

*See* IDM at 33, Appx1207.  Because his responsibilities included meeting with customers

and external parties, Commerce found it likely that Mr. X played a role in price

negotiations and export practice.  *See id*.  Commerce further concluded that Mr. X's

presence on the boards of IDI and Company Y, along with his role in Company Y's

management, indicates that the Vietnamese government is involved in company-level

decision making.  *See id.*

     This Court has held that Commerce may "make reasonable inferences from the

record evidence" when examining the totality of the circumstances in determining

whether a respondent had demonstrated an absence of *de jure* and *de facto* control of its

export activities.  *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp.

3d 1263, 1266 (Ct. Int'l Trade 2015).  Here, Commerce did not base its finding of *de

facto* control on "a single board member's involvement with a local provincial

government," as IDI contends, Pl. Br. at 35, but rather, on the totality of the

circumstances.  Commerce reasonably inferred from the record evidence that the

presence of a government official on the boards of IDI/Company Y, "in addition to the existence of multiple associates or members of the Communist Part{y} of Vietnam, taken together, . . . supports a finding of *de facto* control." IDM at 34 n.158, Appx1208.

Upon examining the totality of record evidence, Commerce further found that Mr. X's influence on the board was heightened and expanded by virtue of the fact that numerous other members of IDI and Company Y were associated with the Communist Party of Vietnam. *See id.* As Commerce explained, "Vietnam has a one-party system, and when an individual is a member of that party, the Communist Party of Vietnam, membership signifies that an individual is not just sympathetic to the ruling Vietnamese government's goals, but is an active participant furthering those goals." *Id.* at 33, Appx1207. Indeed, in assessing the record evidence, Commerce found nothing to suggest that any of the Communist Party of Vietnam members/associates on the boards of IDI and Company Y had voted or acted in a manner at odds with Mr. X, nor had they undermined his authority, or by extension, that of the Vietnamese government's. *See id.*

As to IDI's argument that Commerce "merely speculates" as to the potential impact of IDI's association with the Communist Party of Vietnam on the government's control over IDI due to "mere membership or association with the Communist Party," *see* Pl. Br. at 40, 43, there are indeed differences between government positions and Communist Party of Vietnam membership. IDM at 33-34, Appx1207-1208. But contrary to IDI's assertion, "mere" membership in the Communist Party of Vietnam is *not* meaningless for purposes of analyzing the presence of government control. *See id.* As Commerce explained, "when a government official, such as Mr. X, is in a position of

authority and power in companies such as IDI and Company Y, absent record

information to the contrary, it is reasonable to presume that members of the Communist

Party of Vietnam also in power in those companies will support and affirm the votes and

influence of that government official to further the goals of the Vietnamese government."

*Id.* at 33, Appx1207.

Moreover, other proprietary information on the record supports Commerce's

finding that informal arrangements influence decisions of the board. *See generally* IDI

BPI Addendum, Appx80392-80394. As Commerce explained, the board of IDI [███]

████████████████████████████████████████████████████

██████████ *See id*. at 2, Appx80393; IDI SRA at Exh. 7 (C.R. 9-15, P.R.

26-29), Appx80056-80058. Additionally, Commerce observed that the Company Y Sub

Party Committee [█████████████████████████████████

████████████████████████████████]. *See IDI* BPI

Addendum at 2, Appx80393; IDI SRA at Exh. 7, Appx80056-80058. This resolution

[████████████████████████████████████████████████

████████████████████████████████████████████████

██████████] IDI BPI Addendum at 2, Appx80393; *see also* IDI SRA at Exh. 3

(C.R. 9-15, P.R. 26-29), Appx80034-80042. Finally, Commerce observed that the

provincial government, of which Mr. X is a member, [██████████████████

████████████████████] *See* IDI BPI Addendum at 2, Appx80393;

IDI Second Supp. SRA (C.R. 370-381, P.R. 244), Appx80277-80292.

Collectively, the totality of record evidence supports Commerce's finding that IDI failed to rebut the presumption of *de facto* control by the Vietnamese government. Consistent with Commerce's determination, the record evidence indicates that there are "several avenues" through which the Vietnamese government could, and did, affect IDI's operation. *See* IDM at 33-34, Appx1207-1208. Taken together, these factors indicate that Commerce's finding that the Vietnamese government controls IDI through "traditional corporate control" is not speculative, but, rather, is grounded in substantial record evidence. *See id.*

## III. Commerce's Determination That IDI Is Not Entitled To A Separate Rate Is Lawful

Without ever clearly identifying the alleged source of the "applicable legal requirements," IDI also argues that Commerce committed legal error in rejecting IDI's separate rate application in the final results, and "arbitrarily and unreasonably" applied a "harshly punitive" country-wide anti-dumping duty rate to IDI. *See* Pl. Br. at 12. Tellingly, IDI identifies no statutory or regulatory authority that Commerce supposedly violated. Although IDI eventually concedes that Commerce's separate rate practice is, in fact, a practice, *id.*, it mischaracterizes controlling Supreme Court and Federal Circuit precedent regarding the limited extent to which Commerce is legally bound by its own practice. *See, e.g.*, *Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1379 (Ct. Int'l Trade 2007) (an example of a case where Commerce established a practice by "repeatedly and regularly" utilizing a methodology, though not exclusively). But

because Commerce did not change its longstanding practice in this review, IDI's misstatements of law in its brief are ultimately irrelevant.

In reality, Commerce's separate rate analysis, as applied to IDI and explained below, follows long-standing agency practice, and has been affirmed repeatedly by the Federal Circuit. *See, e.g.*, *New Mexico Garlic Growers Coal. v. United States*, 953 F.3d 1358, 1361 (Fed. Cir. 2020) (affirming that a party may rebut the presumption of government control and obtain a separate rate by "establishing the absence of both *de jure* (in law) and *de facto* (in fact) government control over its export activities"); *AMS Assocs.*, 719 F.3d at 1379 (sustaining the *de jure* and *de facto* criteria); *Sigma Corp.*, 117 F.3d at 1405  ("{I}t was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control."); *see also Diamond Sawblades from China*, 71 Fed. Reg. at 29,307; *Silicon Carbide from China*, 59 Fed. Reg. at 22,586-87; *Sparklers from China*, 56 Fed. Reg. at 20,589; Policy Bulletin No. 05.1 at 1, available at http://enforcement.trade.gov/policy/bull05-1.pdf.

## A. Once A Separate Rate Applicant Fails To Establish One Criterion, Commerce Need Not Analyze The Remaining *De Facto* Criteria

IDI argues that in determining *de facto* government control in its separate rate analysis, Commerce was required to, and failed to, apply all four of the relevant *de facto* criteria by basing its finding on only one factor (*i.e.*, management control) and ignoring the three remaining factors. *See* Pl. Br. at 15-16.  In other words, IDI argues that Commerce is obligated—by an as-yet unidentified source of legal authority—to

review and analyze each of the four factors referenced in its final results. *See* Pl. Br. at 18, even if a company fails one of the four criteria. The Court should reject IDI's misunderstanding of Commerce's separate rate analysis in this regard.

As previously explained, when Commerce determines *de facto* government control of an enterprise's export functions, Commerce examines: (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; *and* (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses. *See Silicon Carbide*, 59 Fed. Reg. at 22,586-89.

In *Shandong Rongxin Import & Export Co. v. United States*, 203 F. Supp. 3d 1327, 1348 (Ct. Int'l Trade 2017), the Court remanded Commerce's final results on the issue of its *de facto* separate rate analysis for "further determination regarding consideration of the other criteria, as well as a determination of the ultimate calculus, including the impact of the criterion regarding autonomous selection of management." However, the Court declined to express a view "as to whether the question of entitlement to a separate rate is to be determined under a totality of the circumstances, whether a respondent must satisfy each of the four criteria," or whether "the failure to establish autonomy from the government in the *selection of management* . . . can alone justify denial of a separate rate . . . ." *Id.* at 1348-49 (emphasis added).

Similarly, in *Yantai*, the Court held that "Commerce requires that exporters satisfy *all four* factors of the *de facto* control test in order to qualify for separate rate status." *Yantai*, 203 F. Supp. 3d at 1317 (citing *Adv. Tech. II*, 938 F. Supp. 2d at 1349) (emphasis added). The Court therefore held that a full analysis of each of the *de jure* and *de facto* criteria is not necessary to find that a company is separate from a non-market economy entity. *Id.* at 1326; *see also Adv. Tech. II*, 938 F. Supp. 2d at 1345 (sustaining a determination where Commerce did not make any finding on two of the four *de facto* prongs). Accordingly, Commerce need only find that a respondent fails one criterion of the separate rate criteria analysis to deny it a separate rate, and need not examine all four criteria. *See Yantai*, 203 F. Supp. 3d at 1326 ("Yantai CMC failed to meet the third factor of the test. Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis.").

Here, in the underlying administrative review, Commerce found that IDI had not demonstrated independence from government ownership and control. Specifically, Commerce observed that a separate rate applicant "must show that the government neither actually selects management nor directly or indirectly involves itself in the day-to-day management of the company" to demonstrate independence from the government, and determined that IDI was unable to meet those conditions. *See* IDM at 32 (quoting *An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United State*s, 203 F. Supp. 3d 1256, 1289-90 (Ct. Int'l Trade 2017)), Appx1206. Upon this finding, and consistent with *Yantai* and *Advanced Technology II*, Commerce was not required to examine whether IDI established that it operates free from government control with respect to the other three

20

*de facto* criteria once IDI failed to establish one criterion. *See Yantai*, 203 F. Supp. 3d

1at 1326; *Adv. Tech. II*, 938 F. Supp. 2d at 1345.

    **B.**    **Commerce's Determination That The Vietnamese Government Has Ownership Interest In, And Control Over, IDI Is In Accordance With Law**

        **1.**    **Legal Framework Of Ownership And Control In Commerce's Separate Rate Analysis**

    Under its separate rate practice, Commerce examines instances of "potential

control" as well as "actual control." For example, evidence of indirect or direct

government ownership is a sufficient evidentiary basis on which to conclude that a non-

market economy government has the ability to exercise control over a company such

that the company is ineligible for a separate rate. *See Carbon and Certain Alloy Steel*

*Wire Rod from the People's Republic of China*, 79 Fed. Reg. 53,169 (Dep't of

Commerce Sept. 8, 2014) (prelim. LTFV determ.), and accompanying PDM, unchanged

in *Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China*, 79

Fed. Reg. 68,860 (Dep't of Commerce Nov. 19, 2014) (final LTFV determ.).

    Moreover, even where a respondent is not majority owned by a governmental

entity, Commerce considers the totality of the circumstances and may make a reasonable

inference that the respondent does not control its export activities. Commerce explained

that, although its practice is to determine  that majority government ownership means

that a government "exercises, or has the potential to exercise, control over the

company's operations generally," it is also its "practice to examine whether the

government might also be able to exercise, or have the potential to exercise, control of a

company's general operations through *minority* government ownership under certain factual scenarios." *Antidumping Duty Investigation of Stainless Steel Sheet and Strip from the People's Republic of China*, 82 Fed. Reg. 9,716 (Dep't of Commerce Feb. 8, 2017) (final LTFV determ.), and accompanying IDM at cmt. 1 (emphasis in original); *see also id.* at 6-7 (citing *1,1, 1, 2 Tetrafluoroethane (R-134a) from the People's Republic of China*, 82 Fed. Reg. 12,192 (Dep't of Commerce Mar. 1, 2017) (final determ.)) (*Tetra 2017*); *Truck and Bus Tires from the People's Republic of China*, 82 Fed. Reg. 8,599 (Dep't of Commerce Jan. 27, 2017) (final admin. determ.), and accompanying IDM at cmt. 1 (*Truck & Bus Tires from China*).

Following the Court's decisions in *Advanced Technology I* and *Advanced Technology II*, Commerce clarified its practice and concluded that where a government entity holds a majority ownership share, either directly or indirectly in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the *potential* to exercise control, over the company's operations generally. *See Adv. Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) (*Adv. Tech. I*); *Adv. Tech. II*, 938 F. Supp. 2d at 1345. This Court has upheld Commerce's clarification, holding that "to the extent that potential control means the ability to exercise actual control (even without exercising it), Commerce is correct that the standard in a situation of majority government ownership is potential control." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018).

But whether a government entity owns a majority equity share is only part of

Commerce's *de facto* control analysis. *See Adv. Tech. II*, 938 F. Supp. 2d at 1346

(citing *Qingdao Taifa Grp. Co., Ltd. v. United States*, 637 F. Supp. 2d 1231, 1242 (Ct.

Int'l Trade 2009)) ("{G}overnment ownership alone is not dispositive of control.");

*Carbon and Alloy Steel Cut-to-Length Plate from China*, 82 Fed. Reg. 8,510 (Dep't of

Commerce Jan. 26, 2017) (final admin. determ.) and accompanying IDM at cmt. 2;

*Tetra 2017* IDM at cmt. 1. That is because "{w}here a majority shareholder has

potential control that control is, for all intents and purposes, actual control," and "{i}n

such a situation actual control is inherent in the fact that the majority shareholder can

typically control the operations of a company without actually removing directors or

management since it is clear that directors or management could be removed." *An*

*Giang Fisheries*, 284 F. Supp. 3d at 1359.

Commerce has also concluded, in cases where the government or a governmental

entity holds a minority of shares, that the totality of the factual circumstances supports a

conclusion that the respondent nonetheless is not autonomous in its export activities.

*See, e.g.*, *Truck and Bus Tires from China* IDM at cmt. 1 (finding state control where

the government owned 49.06 percent of the respondent); *53-Foot Domestic Dry*

*Containers from the People's Republic of China*, 80 Fed. Reg. 21,203 (Dep't of

Commerce Apr. 17, 2015) (final admin. determ.), and accompanying IDM at cmt. 10

(finding indirect control by minority shareholders as accounting for 48.2 percent of the

respondent, who were in turn owned by a state-owned entity); *Tetra 2017* IDM at cmt. 1

(finding control where the management was beholden to a sole owner, whose board is

controlled by a state-owned company).  In these instances, "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."  *An Giang Fisheries*, 284 F. Supp. 3d at 1359.

### 2.  The Vietnamese Government's Ownership Interest In IDI

IDI argues that Commerce's decision not to address government ownership is "inherently unreasonable," and, at a minimum, Commerce must provide an adequate explanation regarding its decision to examine factors other than government ownership. *See* Pl. Br. at 25-26.  On the contrary, Commerce demonstrates below that it adequately explained its decision to base its finding of *de facto* control, regardless of government ownership, on the presence of a government official, in addition to several associates or Communist Party members, on the boards of IDI and Company Y.  *See* IDM at 34, Appx1208.

By way of background, in December 2010, Commerce published a Federal Register notice to announce that it was considering revising its practice with respect to *de facto* criteria examined for the purpose of determining whether to grant separate rate status to individual exporters in antidumping cases involving non-market economy countries.  *See De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 75 Fed. Reg. 78,676 (Dep't of Commerce Dec. 16, 2010).  Commerce invited public comment on its then-current practice.  *See id.*  Commerce subsequently published notice on July 5, 2013, of its intent

to consider certain changes to its practice with respect to *de facto* criteria on a case-by-case basis. *See De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430, 40,433 (Dep't of Commerce July 5, 2013) (*De Facto Notice*). Regarding membership in the Communist Party of Vietnam, Commerce explained that one commenter had suggested that Commerce "should find that a respondent is materially dependent on the government and deny the respondent a separate rate where two or more company managers or members of the board of directors are members of the Communist Party . . . ." *Id.* At the time, Commerce determined not to consider two or more Communist Party members, alone, as part of its separate rate analysis. *See id.* However, Commerce also indicated that it might consider such factors, as well as others, on a case-by-case basis in the future, should the facts in a given case suggest such consideration is warranted. *See id.* at 40,434.

In the final results, Commerce acknowledged that its practice in non-market economy cases is usually "to address circumstances where the government entity holds either majority ownership (such that the potential for control exists based on ownership alone), *or* where the government does not hold a majority ownership interest but might nonetheless be able to exercise, or have the potential to exercise, control of a company's general operations under certain factual scenarios." IDM at 32, Appx1206 (emphasis in original). In this case, however, Commerce did not conduct an analysis of government ownership over IDI. Rather, Commerce properly determined that "several avenues" were

sufficient to find *de facto* control in this administrative review, regardless of government

ownership interest. *See id.* at 33-34, Appx1207-1208.

Specifically, Commerce relied on the presence of a government official (Mr. X),

in addition to there being ███████████████████████████████████████

███████████████████████████████ IDI BPI Memorandum at 1,

Appx80391, to support a finding that the Vietnamese government could, and did, impact

the operation of IDI. *See* IDM at 33-34, Appx1207-1208. Commerce determined that in

the facts of this case, the presence of a government official on the board of IDI and

Company Y, in addition to the existence of multiple associates or members of the

Communist Party of Vietnam on these boards, taken together, for the reasons explained

above, supports a finding of *de facto* control because "the government can control the

company through traditional corporate control." IDM at 34, Appx1208; *see* IDI BPI

Memorandum at 1-2, Appx80391-80392. Accordingly, Commerce adequately explained

its finding of government control, regardless of government ownership.

### 3. Commerce's Determination That The Vietnamese Government Potentially, And Actually, Controlled IDI, Is In Accordance With Law

With reference to the *de facto* criteria laid out in Policy Bulletin 05.1, IDI argues

that Commerce applied the wrong legal standard in determining whether the Vietnamese

government controlled IDI's activities. *See* Pl. Br. at 20. Specifically, IDI contends that

Commerce "only found that the {Vietnamese government} *had the ability to control*

IDI, and it did not explicitly find that the {Vietnamese government} *actually controlled*

IDI." *Id.* at 21-22 (emphasis in original). In advancing this argument, IDI

misunderstands Commerce's determination in this case: here, Commerce not only determined that the Vietnamese government had potential control over IDI, but also determined that the Vietnamese government had actual control. *See* IDM at 33-34, Appx1207-1208; IDI BPI Memorandum at 1-2, Appx80391-80392.

IDI articulates that determining whether a government exercises *de facto* control over a respondent depends on whether a government exercises actual control over the company. *See* Pl. Br. at 20-21 (quoting *An Giang*, 203 F. Supp. 3d at 1289-90 (noting that respondent need not "rebut the potential for government control" but must only rebut whether there is "actual control by the government entity")). Commerce does not dispute this legal standard, rather, IDI fails to understand Commerce's findings in this regard.

In the final results, Commerce concluded that "there are several avenues through which the {Vietnamese government} can *and does* impact the operation of IDI." IDM at 34, Appx1208 (emphasis added). Commerce not only found that the Vietnamese government "{could} control the company through traditional corporate control," but also concluded that the Vietnamese government *did* control the company through traditional corporate means. *See id.* As previously discussed, substantial evidence supports Commerce's finding that the Vietnamese government exerted actual, as well as potential, control over IDI, and makes clear that Commerce's conclusion regarding control over IDI is in accordance with law. *See* IDM at 33-34, Appx1207-1208; IDI BPI Memorandum at 1-2, Appx80391-80392. As this Court has noted, even if there were a "lack of evidence of specific instances of actual control," that "does not render

Commerce's finding unsupported by substantial evidence; indeed, in the context of majority government ownership, requiring Commerce to point to such evidence turns the presumption on its head by placing the burden on petitioners to prove the absence of autonomy." *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321–22 (Ct. Int'l Trade 2018).

Thus, the Court should hold that Commerce's determination that the Vietnamese government potentially, and actually, controlled IDI, is in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that this Court deny plaintiff's motion for judgment on the administrative record, sustain Commerce's final results in their entirety, and enter judgment for the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

/s/ Kara M. Westercamp

OF COUNSEL:                           KARA M. WESTERCAMP
KIRRIN HOUGH                          Trial Attorney
Attorney                             Commercial Litigation Branch
Office of the Chief Counsel           U.S. Department of Justice
   for Trade Enforcement and Compliance   P.O. Box 480
U.S. Department of Commerce           Ben Franklin Station
                                     Washington, DC 20044
                                     Tel. (202) 305-7571

Fax (202) 514-8624

March 31, 2021                                    Attorneys for Defendant

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| I.D.I. INTERNATIONAL DEVELOPMENT and INVESTMENT CORPORATION, | ) ) ) |
| Plaintiff, | ) ) Court No. 20-00107 |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| CATFISH FARMS OF AMERICA, et al., | ) ) |
| Defendant-Intervenors. | ) ) |

## PROPOSED ORDER

Upon consideration of plaintiff's motion for judgment upon the administrative record, defendant's and defendant-intervenor's responses thereto, replies, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is denied, and it is further

ORDERED that the Department of Commerce determination at issue in this action is sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated: _____, 2021          _____
      New York, New York                                                  JUDGE

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that the public version of defendant's "Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record" in this matter complies with the Court's order regarding type-volume limitation rules. According to the word-count calculated by the word processing system with which the brief was prepared, the brief contains a total of 7,160 words.

March 31, 2021                                    /s/ Kara M. Westercamp

                                                 Kara M. Westercamp