**PUBLIC VERSION**

**Slip Op. 21-82**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 20-00107**

I.D.I. INTERNATIONAL DEVELOPMENT AND
INVESTMENT CORPORATION,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

CATFISH FARMERS OF AMERICA, *et al.*,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

**OPINION**

[The court denies Plaintiff's motion for judgment on
the agency record and grants judgment for Defendant
and Defendant-Intervenors.]

Dated: July 6, 2021

*Robert L. LaFrankie*, Crowell & Moring LLP of Washington, DC, for Plaintiff.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice of Washington, DC, for Defendant. With her on the brief were

**PUBLIC VERSION**

*Brian Boynton*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director; and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Kirrin A. Hough*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP of Washington, DC, for Defendant-Intervenors. With him on the brief was *James R. Cannon, Jr.*

*Baker*, Judge: In this case, a Vietnamese fish exporter challenges the Department of Commerce's denial of its application for a separate antidumping rate and imposition of the far higher country-wide rate generally applicable to frozen fish imports from Vietnam. For the reasons explained below, the court sustains Commerce's decision.

## Regulatory Background

When Commerce imposes antidumping duties on imports from countries with non-market economies, it presumes that all exporters in such countries are controlled by the government. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1340–41 (CIT 2020). Any exporter in a country with a non-market economy will accordingly receive that country's antidumping duty rate unless the exporter applies for a separate rate and demonstrates that it is both *de jure*

**PUBLIC VERSION**

and *de facto* independent of the government. *Id.*[1] If Commerce determines that the applicant failed to demonstrate either type of independence, Commerce denies the separate rate and the applicant receives the country-wide rate. *See 53-Foot Domestic Dry Containers from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value* at 53 (Dep't Commerce Apr. 15, 2015).[2] Thus, Commerce assigns an exporter the country-wide rate by default unless the exporter applies for, and receives, a separate rate.

A separate-rate applicant has the burden of rebutting the presumption of government control. *Zhejiang Zhaofeng Mech. & Elec. Co. v. United States*, 355 F. Supp. 3d 1329, 1333 (CIT 2018) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1406 (Fed. Cir. 1997)). The applicant has this burden because it is the party with "the best access to information pertinent to the 'state control' issue." *Sigma Corp.*, 117 F.3d at 1406 (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production

---

[1] The relevant statute itself is silent about the presumption of government control. *See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1289 & n.46 (CIT 2017) (referring to Commerce implementing the presumption "[t]hrough practice" and noting that 19 U.S.C. § 1677f-1 does not prescribe the presumption).

[2] https://enforcement.trade.gov/frn/summary/prc/2015-08903-1.pdf (accessed July 6, 2021).

should belong to the party in possession of the necessary information.")).

## Factual and Procedural Background

In 2003, Commerce issued an antidumping order applicable to frozen fish imported from Vietnam. *See Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 47,909 (Dep't Commerce Aug. 12, 2003). In that order, Commerce found that certain frozen fish fillets from Vietnam were being sold in the U.S. at less than normal value and imposed duties accordingly. The order imposed specific rates for certain exporters and a "Vietnam-wide" rate for exporters not specifically listed. *See id*. at 47,909–10. In the intervening years, that order has undergone multiple administrative reviews.[3]

This case stems from the 15th such administrative review, which Commerce initiated at the request of Catfish Farmers of America[4] and several of its constituent members. *See Initiation of Antidumping and*

---

[3] For an explanation of the purpose of an administrative review in the regulatory scheme, *see Hung Vuong*, 483 F. Supp. 3d at 1334–35.

[4] Catfish Farmers of America is a trade association representing domestic catfish farmers and processors.

**PUBLIC VERSION**

*Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 50,077, 50,080–81 (Dep't Commerce Oct. 4, 2018).

In an administrative review involving a non-market economy country such as Vietnam,[5] Commerce does not review the country-wide rate unless either a party requests such review or Commerce initiates it. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018*, 84 Fed. Reg. 56,420, 56,421 (Dep't Commerce Oct. 22, 2019).

In the review at issue here, no party requested a review of the Vietnam-wide rate and Commerce declined to initiate such a review. Accordingly, the country-wide rate of $2.39 per kilogram that was already in effect did not change. *Id.* This rate therefore automatically applied to all Vietnamese exporters that did not receive separate rates.

I.D.I. International Development and Investment Corporation, a Vietnamese exporter and the plaintiff

---

[5] *See Notice of Final Antidumping Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 37,116, 37,119 (Dep't Commerce June 23, 2003) (designating Vietnam as a non-market economy for purposes of U.S. antidumping laws).

**PUBLIC VERSION**

in this case, submitted a separate rate application to
Commerce and subsequently submitted three supple-
mental applications. Appx1012–1059 (original);
Appx1065–1113 (first supplemental); Appx1114–1128
(second supplemental); Appx1129–1145 (third supple-
mental). Catfish Farmers opposed IDI's application.
Appx1151–1156.

As it was undisputed that IDI was free from *de jure*
control of the Vietnamese government, Appx1206 &
n.149, Commerce's decision focused on the *de facto*
control test, under which a separate-rate applicant
" 'must show [among other things] that the govern-
ment neither actually selects management nor directly
or indirectly involves itself in the day-to-day manage-
ment of the company' to demonstrate independence
from the government." Appx1206 (quoting *An Giang*,
203 F. Supp. 3d at 1289–90). Commerce determined
that IDI did not meet that standard for several rea-
sons.

First, Commerce found that a government official
and Communist Party member—referred to as
Mr. X[6]—represented the Vietnamese government on
the boards of both IDI and its corporate parent,

---

[6] During the period of review, Mr. X served as deputy of the
People's Council of An Giang Province. Appx1207.

**PUBLIC VERSION**

Company Y.[7] Commerce cited IDI's submissions in finding that the boards "are charged with making 'important decisions of the company' as required by law" and are responsible for selecting the companies' management, "who in turn handle the day-to-day operations of the company, including setting import prices." Appx1207 (citing Appx1192 and Appx1028).[8]

Second, Commerce observed that Mr. X was also a "Deputy General Director" of Company Y, where he was "in charge of external affairs . . . and thus responsible for arranging and attending meetings with the company's investors, customers, partners[,] and visitors from other companies." Appx1207 (omission in

---

[7] [[                    ]]—referred to in this opinion as Company Y—is a [[                                    ]] shareholder of IDI. Appx80023; Appx80075. (Redacted information provides name of Company Y and describes its ownership share of IDI.) Company Y in turn is publicly traded, Appx80075, with "thousands of individuals and entities" holding shares and no "entity shareholder" owning more than [[          ]]. Appx80075–80076, Appx80077. (Redacted information describes maximum percentage ownership by any shareholder in Company Y.) The Vietnamese government has no ownership interest in either IDI or Company Y. Appx80025–80026.

[8] Commerce cited IDI's description of a document attached to the company's separate rate application as showing "the decision of the Board of Directors appointing the General Director of the company," which IDI stated "evidences IDI's independence in the selection of management." Appx1028.

**PUBLIC VERSION**

original) (quoting Appx1119–1120). Commerce concluded that this meant Mr. X—and by extension, the Vietnamese government—was involved in the day-to-day management of both Company Y and IDI. Appx1207. Commerce also noted that Mr. X's meetings with customers and external parties likely included price negotiations and discussions of export practices. Appx1207 n.156.

Third, Commerce found that Mr. X's influence on IDI's board of directors was "heightened and expanded" because [[            ]] of both IDI's and Company Y's boards were Communist Party members. Appx80388; Appx80392 (citing Appx80305–80308). (Redacted information describes extent of party membership among IDI and Company Y board members.) Although Commerce acknowledged that party membership is not the same thing as holding government office, it reasoned that " 'mere' [party] membership" is not meaningless for the government control analysis. Appx1207 (quoting Appx1189).

Specifically, Commerce determined that in a one-party state like Vietnam, party membership

> signifies that an individual is not just sympathetic to the ruling Vietnamese government's goals, but is an active participant in furthering those goals. Accordingly, when a government official, such as Mr. X, is in a position of authority and power in companies such as IDI and

**PUBLIC VERSION**

Company Y, absent record information to the contrary, it is reasonable to presume that members of the Communist Party of Vietnam also in power in those companies will support and affirm the votes and influence of that government official to further the goals of the Vietnamese government.

Appx1207–1208. Thus, Commerce found that Mr. X's position as a government official meant that he effectively led the other party members on the two company boards.

Fourth, the influence of the Communist Party in the affairs of Company Y and IDI wasn't limited to party members [[

]] (Redacted information provides specific examples of party involvement in the affairs of Company Y and IDI.)

Finally, Commerce noted that there was no evidence in the administrative record suggesting that any of the Communist Party members on the board of

**PUBLIC VERSION**

either IDI or Company Y had ever voted or acted in a way contrary to Mr. X. Appx1208. Commerce also found that the specific powers of the two companies' boards, including selection of management, as well as the "particular decisions" of the boards demonstrated the "actual impact" of Mr. X and his party colleagues on IDI's operations. Appx1208.

Based on these findings, Commerce found that the presence of Communist Party members on both companies' boards "emboldened and furthered" Mr. X's authority and control over those companies, such that his presence was representative of the government's interests. Appx1208. Commerce reasoned that "the presence of a government official on the board of IDI/Company Y, in addition to the existence of multiple associates or members of the Communist Part [sic] of Vietnam, *taken together*, for the reasons explained above, supports a finding of *de facto* control." Appx1208 n.158 (emphasis added).

Commerce concluded as follows:

To summarize, there are several avenues through which the [government of Vietnam] can and does impact the operation of IDI. A manager of IDI's parent company, *i.e.*, Company Y, is a government official. That same government official plays a role in the boards of directors, which perform oversight of IDI and its parent and are involved in the selection of management. On

**PUBLIC VERSION**

> both boards, members and associates of the
> Communist Party of Vietnam who are loyal to
> the ruling politicians in the [government of Vi-
> etnam] hold powerful positions. Taken together,
> these factors indicate that the government can
> control the company through traditional corpo-
> rate control. Accordingly, we continue to find
> that IDI is *de facto* controlled by the [govern-
> ment of Vietnam] and is not entitled to a sepa-
> rate rate.

Appx1208. Commerce therefore deemed IDI to be "part of the Vietnam-wide entity." *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 23,756, 23,757 (Dep't Commerce Apr. 29, 2020). This finding meant IDI received the $2.39-per-kilogram rate. *Id.* The successful separate-rate applicants, in contrast, received a rate of 15¢ per kilogram. *Id.*

In response to Commerce's final decision, IDI filed this suit pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) (authorizing "an interested party who [was] a party to the proceeding in connection with which the matter [arose]" to commence an action in this court contesting Commerce's final determination in an administrative review of an antidumping order). *See also* 28 U.S.C. § 2631(c) (authorizing "any interested party who was a party to the proceeding in

**PUBLIC VERSION**

connection with which the matter arose" to commence an action in this court contesting a determination "listed in" § 1516a.

IDI's complaint asks the court to hold that Commerce's final decision denying IDI's separate rate application is "not supported by substantial evidence on the record and otherwise not in accordance with law" and requests a remand to Commerce "for disposition consistent with the final opinion and order of this Court." ECF 7, at 12. Catfish Farmers intervened as of right to defend Commerce's final decision. ECF 15. IDI then filed the pending motion for judgment on the agency record. ECF 28 (public); ECF 27 (confidential). The court thereafter heard oral argument on IDI's motion. ECF 58.

## Jurisdiction and Standard of Review

The court has jurisdiction to hear this case under 28 U.S.C. § 1581(c), which grants this court exclusive jurisdiction over civil actions commenced pursuant to 19 U.S.C. § 1516a.

In actions such as this brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**PUBLIC VERSION**

Under this standard, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record permitted Commerce to reach the conclusion it did even if the court would have reached a different result:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

## Discussion

IDI argues that Commerce's decision to deny the separate rate application was both contrary to law and not supported by substantial evidence. The court considers these arguments in turn.

## I.

## A.

IDI identifies what it contends are three legal errors by Commerce, the first of which is that the

**PUBLIC VERSION**

Department only considered record evidence pertaining to one element of its four-part test for determining independence from *de facto* control. That test is:

> (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the [exporter] has authority to negotiate and sign contracts and other agreements; (3) whether the [exporter] has autonomy from the government in making decisions regarding the selection of management; and (4) whether the [exporter] retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.

*Zhejiang*, 355 F. Supp. 3d at 1333 (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 n.21 (CIT 2013), and *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994)); *see also* Appx1205 (Commerce's recitation of the test).[9]

In its opening brief, IDI argued that it was "unlawful" for Commerce to address only the third element—management autonomy—because "Commerce may not simply base its separate rate findings only on one 'single criterion' (*i.e.*, management control), thereby

---

[9] At argument, counsel for IDI confirmed that IDI does not challenge the validity of Commerce's four-part test.

**PUBLIC VERSION**

ignoring 'the other three prongs.' " ECF 49, at 17–18 (citing *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1348 (CIT 2017) (hereinafter *Rongxin II*)).

But in its reply brief, IDI clarified its argument, stating that

> IDI does not dispute as a legal matter (as the Court held in *Yantai* [*CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317 (CIT 2017)[10]]) that "Commerce [permissibly] requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate."

ECF 51, at 7 n.3.

IDI instead argues that even though a separate-rate applicant must "satisfy all four factors of the *de facto* control test in order to qualify," *id*., Commerce nonetheless is obligated "to review the *evidence submitted, including the evidence provided for all four criteria.*" *Id*. (emphasis added and citing *Rongxin II*, 203

---

[10] In *Yantai*, the court held that a separate-rate applicant's failure to demonstrate any one of the four elements meant that Commerce had no need to examine the remaining elements. *See* 203 F. Supp. 3d at 1326 ("Yantai CMC failed to meet the third factor of the test. Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis.").

**PUBLIC VERSION**

F. Supp. 3d at 1348, and *Shandong Rongxin Imp. & Exp. Co. v. United States*, 331 F. Supp. 3d 1390, 1400–03 (CIT 2018) (hereinafter *Rongxin III*)).

IDI reads too much into *Rongxin II* and *Rongxin III*. In the earlier decision, the court sustained Commerce's determination that the separate-rate applicant did not demonstrate that it selected management autonomously, and, as IDI notes, the court nevertheless remanded for Commerce to address the remaining elements. What IDI fails to acknowledge, however, is that the *Rongxin II* court remanded so Commerce could better explain the nature of the four-part test. *See* 203 F. Supp. 3d at 1348 (remanding for an explanation of the "ultimate calculus"). "In so doing," the court expressly reserved judgment on whether a separate-rate applicant

> must satisfy each of the four criteria, or whether, for example, the failure to establish autonomy from the government in the selection of management, or a finding of lack of such autonomy, can alone justify denial of a separate rate, even when there is evidence supportive of the exporter offered with respect to the other criteria. These are issues that may be addressed on remand.

*Rongxin II*, 203 F. Supp. 3d at 1348–49. Thus, the court in *Rongxin II* required Commerce to address evidence pertaining to all four elements because of its uncertainty as to Commerce's actual standard.

**PUBLIC VERSION**

In the next round following remand, the court answered the question that it reserved in *Rongxin II*: "a respondent must demonstrate that it meets *each criterion* of the analysis in order to be considered de facto independent of the government . . . ." *Rongxin III*, 331 F. Supp. 3d at 1403 (emphasis added) (citing *Yantai*, 203 F. Supp. 3d at 1326 (CIT 2017)); *see also id.* at 1406 ("[T]o be eligible for a separate rate, a company from [a non-market economy] country must establish *each* of the four factors to rebut the presumption of government control." (emphasis in original) (citing *Yantai*, 203 F. Supp. 3d at 1326)).

In view of this legal conclusion and the court's earlier determination in *Rongxin II* that the applicant failed to establish the third element, the *Rongxin III* court's sustaining of Commerce's remand determination as to the remaining elements simply amounted to affirming on alternative grounds, *see* 331 F. Supp. 3d at 1400–03. That the *Rongxin III* court took this additional work upon itself hardly obligated Commerce here to review evidence pertaining to the remaining elements that were no longer material after the Department concluded that IDI failed to establish the third element.

Administrative agencies—no less than courts, private litigants, and the Justice Department's litigating divisions—have finite resources. To require Commerce to needlessly address evidence that is no longer material to the task at hand would be at best nonsensical.

**PUBLIC VERSION**

"The law does not require a vain and useless thing
. . . ." *McMicking v. Schields*, 238 U.S. 99, 103 (1915).

Here, Commerce found that IDI was unable to
demonstrate "that the government neither actually se-
lects management nor directly or indirectly involves
itself in the day-to-day management of the com-
pany."[11] Appx1206 (cleaned up) (citing *An Giang*, 203
F. Supp. 3d at 1289–90); *see also Shandong Rongxin
Imp. & Exp. Co. v. United States*, 415 F. Supp. 3d 1319,
1323 (CIT 2019) (hereinafter *Rongxin 2019*) (affirming
Commerce's finding of *de facto* control when respond-
ent "fail[ed] . . . to show independence in the selection
of management, a dispositive prong in rebutting the
presumption of de facto government control"). As the
four-part test for *de facto* control requires the exporter
to satisfy all four elements to demonstrate inde-

---

[11] The court observes that the standard Commerce applied
here—"that the government neither actually selects man-
agement *nor directly or indirectly involves itself in the day-
to-day management of the company*," Appx1206 (emphasis
added)—arguably deviates somewhat from the actual third
element of Commerce's ostensible four-part test, i.e.,
"whether the [exporter] has autonomy from the govern-
ment in making decisions regarding the selection of man-
agement." Appx1205. IDI has not challenged this aspect of
Commerce's determination, and the parties have treated
Commerce's consideration of the Vietnamese government's
involvement in day-to-day management as part and parcel
of the applicable third element. Accordingly, the court as-
sumes the same.

**PUBLIC VERSION**

pendence, Commerce was entitled to stop there: "Because Plaintiffs failed to satisfy one *de facto* criterion, Commerce had no further obligation to continue with the analysis." *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321 (CIT 2018) (cleaned up). Contrary to IDI's argument, Commerce did not act contrary to law by declining to consider evidence pertaining to the remaining elements that were unnecessary to address.

## B.

IDI asserts that Commerce's second legal error was to "appl[y] the wrong overall legal standard" in considering the *de facto* control test. ECF 49, at 20–21. Specifically, IDI characterizes Commerce as having determined that the Vietnamese government only

> had the *potential* to control IDI and not that it *actually* controlled IDI. This is clear from Commerce's statement that "the government *can control* the company through traditional corporate control." Thus, Commerce only found that the [government of Vietnam] *had the ability* to control IDI, and it did not explicitly find that the [government] *actually controlled* IDI.

ECF 49, at 22 (all emphasis in original) (citation to Appx1208 omitted).

**PUBLIC VERSION**

To begin with, even if IDI's characterization of Commerce's decision were correct, the Department's determination that an exporter is *potentially* controlled by the government—in the sense that the government has the "*ability* to exercise actual control (even without exercising it)"—suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (CIT 2018) (emphasis added); *see also Zhejiang*, 350 F. Supp. 3d at 1318 (noting that where a non-market economy country's government holds a majority stake in an exporter, the *potential* for the government to exert the control it is entitled to exercise suffices for Commerce to find *de facto* control). A puppet master is no less in control when the strings are slack.

In any event, IDI mischaracterizes Commerce's decision, which found that government official Mr. X and his fellow Communist Party members on the boards of IDI and Company Y select company management and make "important decisions," Appx1207, while the company management in turn handles day-to-day operations. "Mr. X's presence on the board of IDI and Company Y, along with his role in Company Y's management, indicates that the [government of Vietnam] *is involved* in company-level decision making." *Id*. (emphasis added).

**PUBLIC VERSION**

Commerce thus found that the Vietnamese government, through the presence of Mr. X and his party colleagues on the IDI and Company Y boards, controls the selection of IDI's management and hence has at least an indirect involvement in day-to-day affairs, while Mr. X himself has direct involvement in such affairs as an executive in Company Y. Commerce therefore did not rely on just the *ability* of the Vietnamese government to control IDI; the Department determined that the Vietnamese government *actually* controls IDI through the involvement of Mr. X and his party colleagues.

## C.

The third and final legal error asserted by IDI is that Commerce failed to consider that the Vietnamese government has no actual ownership interest in the company. IDI argues that as a matter of law, "it is unreasonable for Commerce to find *de facto* control . . . where the Government has no known ownership in the [separate-rate applicant], whether direct or indirect." ECF 49, at 26. In effect, IDI asks the court to hold that a separate-rate applicant rebuts the presumption of control as a matter of law when it demonstrates the absence of any ownership interest by the government of a country with a non-market economy.

Congress, however, delegated to Commerce—not the court—"broad authority to interpret the antidumping statute and devise procedures to carry out the

**PUBLIC VERSION**

statutory mandate." *Sigma Corp. v. United States*, 117
F.3d 1401, 1405 (Fed. Cir. 1997). The court has no au-
thority to foist IDI's proposed *per se* rule upon Com-
merce, and therefore declines IDI's invitation to do so.

## II.

IDI argues that Commerce's decision "is not only
unlawful . . . but it is also otherwise unsupported by
substantial evidence." ECF 49, at 28. IDI asserts es-
sentially three reasons why substantial evidence is
lacking.

First, IDI asserts that its evidentiary submissions
in the record demonstrate that it sets its own export
prices, that it has authority to sign agreements and
negotiate prices, and that it retains the proceeds of its
export sales—the three elements of Commerce's test
for rebutting the presumption of *de facto* governmen-
tal control that the Department did not address.
ECF 49, at 29–32. But as explained above, to rebut the
presumption of governmental control, IDI needed to
establish *all four* elements of the test. Thus, IDI's evi-
dence as to the three elements not addressed by Com-
merce is irrelevant here except insofar as it *also* bears
on the fourth element considered by the Department,
IDI's autonomy in the selection of management. And if
that evidence is relevant here, IDI has not explained
how.

**PUBLIC VERSION**

Second, IDI points to its evidentiary submissions confirming that it "autonomously selects its own management." ECF 49, at 32. This evidence included various certifications and statements by IDI that its management is selected without governmental involvement. *Id*. IDI then asserts that it "satisfied this factor." *Id*. But "[i]t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (CIT 1988). Commerce weighed the evidence and reached a different conclusion. It's not for the court to reweigh the evidence as IDI requests.

Finally, IDI takes aim at the evidence upon which Commerce based its conclusion—"the presence of a government official on the board of IDI and Company Y, in addition to the existence of multiple associates or members of the Communist Party of Vietnam on these boards*, taken together*, . . . supports a finding of *de facto* control." Appx1208 n.158 (emphasis added).

IDI argues that Mr. X's role as a provincial governmental official is irrelevant because his duties have nothing to do with the national government, ECF 49, at 34–36; that regardless of what governmental position he holds, Mr. X casts only one vote on the nine-member boards of Company Y and IDI, *id.* at 36–39; and that Commerce "has not pointed to any actual decision of the company that was impacted or affected by

**PUBLIC VERSION**

the [Vietnamese government] acting through Mr. X," *id.* at 40 (emphasis removed). IDI further argues Communist Party membership by Mr. X and [[

]] IDI and Company Y board colleagues is "meaningless" and based on "outdated stereotypes." *Id.* at 43. (Redacted information describes extent of party membership among IDI and Company Y board members.)[12]

Once again, IDI asks the court to weigh the evidence. As to Mr. X's position in provincial government, Commerce specifically gave respondents notice that its analysis might examine "whether any managers hold government positions at the national *or sub-national government levels.*" *De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430, 40,432 (Dep't Commerce July 5, 2013) (emphasis added); *see also* Appx1208 n.158 (citing that same statement).[13]

---

[12] In response to a question at oral argument, IDI's counsel stated that there is no evidence in the administrative record indicating whether Communist Party membership in Vietnam is open to anyone who wishes to join.

[13] IDI's second supplemental separate rate application admitted that local authorities are part of the government of Vietnam. *See* Appx1124. Moreover, Commerce noted that the provincial government in question [[

]]. Appx80393. (Redacted

**PUBLIC VERSION**

Commerce was entitled to take Mr. X's official role into consideration, and the Department's inference that Mr. X seeks to further government policy is not unreasonable. *See Can Tho Imp.-Exp. Joint Stock Co. v. United States*, 415 F. Supp. 3d 1187, 1192 (CIT 2019) ("Commerce considers the totality of the circumstances for a given period of review and *may draw reasonable inferences* that the respondent company does not control its export activities.") (emphasis added) (citing, *inter alia*, *Domestic Dry Containers from China*, *above*, at 46–53).

Shifting gears, IDI argues that whatever Mr. X's role was in the Vietnamese government, Commerce ascribed far too much significance to him because his was only one of nine votes on the IDI and Company Y boards: "Mr. X is but one of 9 members with the power to vote. As such, he clearly does not have the power to control the company on his own." ECF 49, at 37; ECF 51, at 17 (quoting same). IDI devotes the better part of five pages of its opening brief explaining that the relevant governing documents do not allow a single board member to exercise control. ECF 49, at 35–39.

But Commerce's decision did not rest solely on Mr. X's status as a government officeholder. Critically

---

information describes provincial government actions in connection with Company Y.)

**PUBLIC VERSION**

for present purposes, Commerce coupled that finding with an additional finding that

> Communist Party of Vietnam members and associates [sat] on the boards of both companies. Accordingly, we find that the [government of Vietnam's] interests are represented in IDI (and Company Y) by the presence of the government official, and furthered and expanded by the additional key Communist Party of Vietnam associates/members on the decision-making boards of those companies.

Appx1208. Commerce went on to cite "the actual impact of *Mr. X and the members and associates of the Communist Party of Vietnam* in IDI's operations." Appx1208 (emphasis added).

Thus, IDI's argument that "Mr. X was certainly not in a position to 'control' any actions of either company on his own," ECF 49, at 39, misses the point because Commerce did not find that he controlled either company by himself. Rather, Commerce found that Mr. X *and* his fellow Communist Party members who voted in lockstep with him effectively controlled the company boards. Unlike in *An Giang*, where the court found that Commerce failed to explain its conclusion that smaller shareholders "could not band together" to overcome the government's minority share, *see* 203 F. Supp. 3d at 1293, in this case Commerce explained that the evidence in the administrative record showed

**PUBLIC VERSION**

that the Communist Party members, led by Mr. X, voted as a bloc so as to give the government actual control in practice.

Commerce's conclusion is reinforced by the confidential addendum to its decision, which was drawn from [[

]]. The confidential addendum explained that [[
]]. Appx80392 (citing Appx80305–80308). (Redacted information describes extent of party membership among IDI and Company Y board members.) This is significant because Commerce found that [[

]]. Appx80392 (citing Appx80305–80312 and Appx80034–80042). (Redacted information describes authority of IDI and Company Y boards.)

And as to the Communist Party membership of Mr. X and [[                ]] his IDI and Company Y board colleagues, it isn't for the court to decide whether IDI is correct about "outdated stereotypes." (Redacted information describes extent of party membership among IDI and Company Y board members.) Commerce found that although party membership does not carry the same weight as holding governmental office,

**PUBLIC VERSION**

it is still relevant: "Although we do not disagree with IDI that there are differences between government positions and Communist Party of Vietnam membership, we do not agree that 'mere' membership in the Communist Party of Vietnam is meaningless for purposes of an analysis of government control." Appx1207. Commerce explained its reasons for that finding. *See* Appx1207–1208.

Whether the court agrees or disagrees with that analysis, Commerce was entitled to make it, and it is not for this court to revisit. *Cf. Rongxin 2019*, 415 F. Supp. 3d at 1325 n.3 ("Because inconsistent conclusions could be drawn, Commerce reasonably concluded that [the respondent] did not rebut the presumption that [the government] retained potential de facto control of [the respondent's] Board.") (citing *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)).

In any event, Commerce did not rely on its inference regarding the presumed voting behavior of the Company Y and IDI board members who are Communist Party members—it determined that in practice, those board members voted in lockstep with Mr. X, the government official also serving on the boards. Appx1208.

Finally, in its reply brief, IDI argues for the first time that the court should remand and order Commerce to address the power of the Company Y and IDI

**PUBLIC VERSION**

shareholders to "ratify the 'election, dismissal, and re-
placement' " of board members and to approve all
changes in the organizational structure or changes to
the charter. ECF 51, at 26–27 (quoting IDI's opening
brief, ECF 49, at 38, which in turn quoted Article
14.2.e of IDI's charter, Appx80111).[14] IDI argues that
*even if the Vietnamese government "somehow control[s]*
*the Board[s], the [Vietnamese government] still cannot*
*control the shareholders*." ECF 51, at 26 (emphasis
added).

Before Commerce, however, IDI did not argue that
the shareholders' authority negated any control by the
government over the company boards; to the contrary,
IDI argued that the shareholders' authority was of no

---

[14] In the quoted passages from IDI's opening and reply
briefs, IDI characterized the shareholders' power as the
power to "ratify" the "election, dismissal, and replacement"
of board members. The court's review of the English trans-
lation of the IDI and Company Y corporate charters indi-
cates that the shareholders have the power to "adopt deci-
sions in writing" regarding, among other things, the "[t]he
election, dismissal, and replacement" of board members.
*See* Appx80111 (IDI charter Article 14.2.e); Appx80159
(Company Y charter Article 14.2.e). The court construes
these provisions as providing that the shareholders may
elect, dismiss, and replace board members, not merely "rat-
ify" the election, dismissal, and replacement of board mem-
bers.

**PUBLIC VERSION**

moment.[15] Having told Commerce that the shareholders' authority was of no consequence (and in effect, not worth considering), IDI is now judicially estopped from contending otherwise.

"The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). Judicial estoppel "applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts." *Trustees in Bankr. of N. Am. Rubber Thread*

---

[15] *See* Appx1023 (IDI's statement to Commerce that it "is a publicly-listed company on the Ho Chi Minh city stock exchange. As such, there are thousands of individuals and entities who buy and sell shares of IDI on a daily basis. As such, it is not possible for IDI to report information on those shareholders, as they are constantly in flux. *However, since those shares are bought and sold on the Ho Chi Minh city stock exchange, these shareholders are mere stock holders, and do not have the ability to control or influence the day-to-day operations of IDI.*") (emphasis added); *see also* Appx1075–1076 (IDI making the identical argument regarding the authority of Company Y's shareholders, with this additional sentence: "By way of example, General Motors' day-to-day operations are not 'controlled' by the thousands of individuals/entities that own a share of General Motors.").

**PUBLIC VERSION**

*Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000)).

Considerations that inform application of judicial estoppel in the administrative law context include

> (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading [the agency] to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the [agency] or the [reviewing] court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (cleaned up).

Each of these considerations applies here. IDI's position in this court—that Commerce should have addressed the shareholders' authority—is inconsistent with its position below, where IDI effectively told the Department not to do so because the shareholders' authority was insignificant. Commerce accordingly did not address the shareholders' authority. To require Commerce on remand to now address an issue that IDI told it not to consider would be to give the latter an unfair advantage. Not only that, it would incentivize

**PUBLIC VERSION**

parties in administrative proceedings to plant remand booby traps by affirmatively downplaying issues.

And even if IDI is not judicially estopped from raising its new shareholder authority argument, it waived that argument by failing to raise it in its opening brief in this court. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief— they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.") (emphasis in original). In its opening brief, IDI at most made a passing reference to its new shareholder authority argument. *See* ECF 49, at 40 (arguing that "Commerce has not explained how" the Vietnamese government "exerted control over Mr. X . . . . This is particularly true in light of the operational procedures (discussed above) specified in the corporate charters . . . ."). Passing references do not raise arguments. *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012) ("ArcelorMittal makes passing reference to other [issues], but ArcelorMittal has not briefed those issues sufficiently to preserve them.").

Finally, even if IDI had properly raised it in its opening brief, this argument fails on the merits because the shareholders' authority to elect and dismiss board members does not fairly detract from Commerce's decision. *Cf. Hung Vuong*, 483 F. Supp. 3d

PUBLIC VERSION

at 1366 (Commerce must address information in the record that "fairly detracts" from its decision).

To begin with, IDI—the entity at issue—is [[            ]] by Company Y, Appx80075 (redacted information describes ownership proportion), which Commerce has found is controlled by the government through Mr. X and his party colleagues on the board. If the shareholders' authority actually matters, as IDI now belatedly contends, the Vietnamese government (according to Commerce) *can* control [[            ]] of IDI's shares. (Redacted information describes ownership proportion.)

More importantly, IDI was right the first time when it told Commerce that the shareholders' authority was of no moment in this context. IDI's *board*—not its shareholders, much less Company Y's shareholders—selects IDI's management, which "in turn handle[s] the day-to-day operations of the company, including setting export prices." Appx1207. Commerce concluded that during the period of review here, the Vietnamese government effectively controlled the IDI and Company Y boards through the good offices of Mr. X and his party colleagues. Whatever their nominal authority to do otherwise, in practice the IDI and Company Y shareholders placed agents of the Vietnamese government in control of the company boards, which in turn selected management. Accordingly, the nominal authority of the IDI and Company Y shareholders to replace the Vietnamese government's agents on the

**PUBLIC VERSION**

company boards does not fairly detract from Commerce's decision.

* * *

In antidumping proceedings involving imports from a country with a non-market economy such as Vietnam, Commerce presumes that all producers and exporters are under government control, and their burden is to prove otherwise. In this case, substantial evidence permitted Commerce to conclude that the Vietnamese government exercised control over IDI and Company Y through the presence of Mr. X and fellow Communist Party members on the company boards who followed his lead. As those boards selected management of both companies, and as Mr. X was also involved in the management of Company Y, Commerce reasonably concluded that IDI did not rebut the presumption of *de facto* government control because "autonomy from the government in making decisions regarding the selection of management" is one of the four elements a party seeking a separate rate must demonstrate.

## Conclusion

For the reasons explained above, the court denies IDI's motion for judgment on the agency record and grants judgment on the agency record in favor of the government and Catfish Farmers. *See* USCIT 56.2(b) (authorizing the court to enter judgment in favor of a

**PUBLIC VERSION**

party opposing a motion for judgment on the agency record, "notwithstanding the absence of a cross-motion"). A separate judgment will enter. *See* USCIT R. 58(a).

Dated:  July 6, 2021          /s/ *M. Miller Baker*
        New York, NY          M. Miller Baker, Judge